## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| Fattima Lagayan, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 15-cv-01953 (APM) |
| ) | |
| Mustafa Odeh, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Fattima Lagayan claims that Defendant Mustafa Odeh and his wife, Defendant Sama Atallah, illegally trafficked her into the United States and forced her to work for them without pay. She has sued Defendants under various federal statutes and asserted several common law torts. Before the court is Defendants' Partial Motion to Dismiss, in which Defendants seek to dismiss nine claims under Federal Rule of Civil Procedure 12(b)(6). Those counts are: (1) Counts I through V for violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1595; (2) Count VI for conspiracy to violate 42 U.S.C. § 1985(3) and the Thirteenth Amendment, and Count IX for civil conspiracy; (3) Count XII for fraudulent inducement; and (4) Count XIII for false imprisonment.

For the reasons discussed below, the court grants Defendants' Motion in part and denies it in part. The court holds that Plaintiff has stated plausible claims under the Trafficking Victims Protection Act, for civil conspiracy, and for fraudulent inducement. The court, however, holds that Plaintiff has not made out claims of conspiracy to violate 42 U.S.C. § 1985(3) and the

Thirteenth Amendment and therefore will dismiss those claims.   Additionally, the court, by Plaintiff's consent, will dismiss her claim for false imprisonment.

## I.      BACKGROUND

### A.      Factual Background

In 2009, Plaintiff—a citizen of the Philippines—was employed as a domestic worker when she was recruited to work abroad.  Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 14, 16.  Two years later, the agency that recruited her smuggled her out of the Philippines and, after stops in Malaysia and Bahrain, brought her to its offices in Jordan.  *Id.* ¶¶ 18-24.  Plaintiff then signed a contract obligating her to work for two years for whomever the agency selected.  *Id.* ¶ 26.  Shortly thereafter, she was placed with Defendant Lama Odeh ("Lama"), a resident of Jordan.  *Id.* ¶ 27. Plaintiff has yet to serve Lama with the Complaint; therefore, she is not before the court.

From March 2011 to November 2012, Plaintiff worked for Lama, who held her passport. *Id.* ¶¶ 28-29.  During the course of her employment, Plaintiff was "physically, emotionally, and verbally abus[ed]."  *Id.* ¶ 32.  Lama called her an "animal" and even "threatened to kill Plaintiff because Defendant Lama felt . . . Plaintiff had not performed a domestic task adequately."  *Id.* ¶¶ 32-33.  Twice, Plaintiff escaped through a window and went to the agency to complain about her treatment, but she was ignored and sent back to work for Lama.  *Id.* ¶ 34.  After the second attempted escape, Lama asked Plaintiff if she would like to work for Lama's brother—Defendant Mustafa Odeh ("Mustafa")—in the United States, but "Plaintiff said no."  *Id.* ¶ 35.  Lama asked two more times, but she received the same negative response each time.  *Id.*

In October 2012, Lama told Plaintiff that Plaintiff would be accompanying her family for a month-long trip to the United States with Mustafa.  *Id.* ¶ 36.  A week before the trip, however, Lama told Plaintiff that Plaintiff instead would be travelling alone to the United States to work for

Mustafa for the month-long period.  *Id.* ¶¶ 36-37.  While Plaintiff did not want to go, she "felt that she was required to do so."  *Id.* ¶ 37.

In early November 2012, Lama arranged for Plaintiff to be dropped off at the airport where she received her passport.  *Id.* ¶ 38.  She then boarded a plane to Dubai, where Mustafa was waiting for her.  *Id.*  There, Mustafa told Plaintiff that she would be working for him for seven months and that he would pay her "at the same rate Defendant Lama had plus a little more[.]"  *Id.*  Mustafa took Plaintiff's passport for the duration of the flight, gave it back to her as they went through customs and immigration, and then seized it again before they left the airport in the United States.  *Id.* ¶ 39.  Mustafa and his wife, Defendant Sama Atallah ("Atallah")—the court will collectively refer to Mustafa and Atallah as "Defendants" in this Memorandum Opinion—kept Plaintiff's passport hidden in their home for the entirety of Plaintiff's stay with them.  *Id.*

From the time Plaintiff arrived in the United States on November 5, 2012, she worked for Defendants as a "live-in domestic worker."  *Id.* ¶¶ 40-41. During that time, Plaintiff worked each day of the week, including weekends, from 7 or 8 a.m. until 10 or 11 p.m.  *Id.* ¶¶ 43-44.  Plaintiff was required to perform various household chores, including preparing meals, doing dishes, caring for Defendants' young child, and cleaning the house.  *Id.* ¶ 44.  She was not permitted to speak to anyone outside the family—"particularly other Filipinos," *id.* ¶ 49—nor was she allowed to leave the apartment by herself, *id.* ¶ 46.  Plaintiff claims that she "could not have left the . . . apartment building on her own in any event, because the elevator to Defendants' floor required a key card to operate[,]" which she did not have.  *Id.* ¶ 48.  Although Plaintiff was permitted to contact her family in the Philippines, she was allowed to do so only once a month for ten to thirty minutes.  *Id.* ¶ 46.  In addition, when Defendants' family entertained guests, Mustafa's father often verbally abused Plaintiff.  *Id.*

Plaintiff was afraid to break Defendants' rules "because of her experience in Jordan" with Lama. *Id.* ¶ 49. While she "did not know precisely what would happen if she violated the rules . . . she understood them as threats." *Id.* Because she did not speak English, she had no knowledge of the United States legal system—or her immigration status. And, because she did not have access to her passport, Plaintiff "feared that if she tried to talk to a police officer, she would be arrested and deported." *Id.*

Initially, Mustafa asked Plaintiff whether she would prefer to be paid monthly or at the end of her time with Defendants. *Id.* ¶ 50. Even though she asked to be paid monthly, Mustafa said he would hold her wages, as it would be "safer" for him to do so. *Id.* A few months into her time with Defendants, Plaintiff informed them that her father was ill, had been hospitalized, and needed money for treatment. *Id.* ¶ 51. At first Defendants told Plaintiff that they would pay her "tomorrow," and then that they would pay her upon returning to Jordan, but they never did. *Id.* Plaintiff began to believe that Defendants would never pay her. *Id.* ¶¶ 51-52.

Shortly thereafter, Plaintiff gained the attention of a Filipina woman—Sofia Maulana— during one of the family's weekly trips to the mosque. *Id.* ¶ 53. Recognizing that Plaintiff was scared to speak to her, Maulana wrote her name and phone number on a napkin and gave it to Plaintiff when Mustafa was not looking. *Id.* A week or so later, Plaintiff called Maulana late at night to ask for help. *Id.* ¶ 54. Together, they planned Plaintiff's escape. In late March 2013, Plaintiff packed her belongings and fled Defendants' apartment late at night to meet Maulana. *Id.* ¶¶ 54-55.

## B.    Procedural History

On November 4, 2015, Plaintiff filed her Complaint in this court against Mustafa, Atallah, and Lama. *See generally* Compl. As noted, Plaintiff only has served Mustafa and Atallah;

therefore, they are the only Defendants before the court.  Defendants answered some of the claims,[1]

and moved to dismiss as to others.  *See generally* Defs.' Mem. of P. & A. in Supp. of their Mot. to

Dismiss, ECF No. 10-1 [hereinafter Mot. to Dismiss].  Their Partial Motion to Dismiss is now ripe

for consideration.

## II.    LEGAL STANDARD

In evaluating a motion to dismiss under Rule 12(b)(6), the court must accept the plaintiff's

factual allegations as true and "construe the complaint 'in favor of the plaintiff, who must be

granted the benefit of all inferences that can be derived from the facts alleged.'"  *Hettinga v. United*

*States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608

(D.C. Cir. 1979)).  The court need not accept as true "a legal conclusion couched as a factual

allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "inferences . . . unsupported by the

facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir.

1994).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim

is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*,

550 U.S. at 556).  The factual allegations in the complaint need not be "detailed"; however, the

Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me

accusation."  *Id.* (citing *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause

---

[1] Defendants filed an Answer as to Counts VII (Fair Labor Standards Act), VIII (failure to pay minimum wage), X (unjust enrichment), and XI (quantum meruit).  *See* Defs.' Answer to Counts VII, VIII, X and XI of Pl.'s Compl., ECF No. 9.

of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). If the facts as alleged fail to establish that a plaintiff has stated a claim upon which relief can be granted, a court must grant defendant's Rule 12(b)(6) motion. *See Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.,* 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

## III.   DISCUSSION

### A.   TVPA Claims (Counts I-V)

In 2000, Congress passed the Trafficking Victims Protection Act (TVPA) "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominately women and children, and to ensure just and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106-386, § 102(a), 114 Stat. 1464 (2000). One of the TVPA's major elements was to criminalize and increase penalties for various forms of trafficking. *See id.* § 112. As relevant here, the TVPA added the following sections to Title 18 of the United States Code: (1) 18 U.S.C. § 1589, which prohibits providing or acquiring the labor or services of a person by force or threats; (2) 18 U.S.C. § 1590, which prohibits recruiting, harboring, or transporting a person to provide or obtain such person's labor or services; and (3) 18 U.S.C. § 1592, which prohibits destroying, concealing, removing, confiscating, or possessing a passport or other immigration document of another person for the purpose of subjecting the person to involuntary servitude.

Initially, the TVPA did not provide a civil remedy to victims of trafficking. That changed, however, with the passage of the Trafficking Victims Protection Reauthorization Act of 2003. *See* Pub. L. No. 108-193, 117 Stat. 2875 (2003). That Act provided that "[a]n individual who is a victim of a violation of section 1589, 1590, or 1591 of [Chapter 77 of Title 18] may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover

damages and reasonable attorneys fees." *Id.* § 4(a)(4)(A).  Five years later, Congress expanded

that provision by allowing a trafficking victim to sue her perpetrator for a violation of any section

of Chapter 77 of Title 18.  Pub. L. No. 110-457, § 221(2), 122 Stat. 5044 (2008).  Thus, as presently

codified, the TVPA provides that "[a]n individual who is a victim of a violation of this chapter

may bring a civil action against the perpetrator . . . in an appropriate district court of the United

States and may recover damages and reasonable attorneys fees."  18 U.S.C. § 1595(a).

Against this legislative backdrop, Plaintiff advances multiple claims for trafficking-related

violations under the civil remedies provision of the TVPA.  In Count I, she alleges a violation of

18 U.S.C. § 1590; in Count II, she alleges a violation of 18 U.S.C. § 1589; in Count III, she alleges

a violation of 18 U.S.C. § 1584; in Count IV, she alleges a violation of 18 U.S.C. § 1592; and in

Count V, she alleges a violation of 18 U.S.C. § 1593A.  For reasons that will become apparent, the

court starts with Counts II and III.

### 1.    Counts II and III

Defendants move to dismiss Counts II and III on the grounds that "Plaintiff . . . does not

allege that she was physically mistreated, harmed, or explicitly threatened in any way by

Defendants Mustafa and Atallah such that she lacked the ability to leave their home, which she

ultimately did."  Mot. to Dismiss at 7.  In essence, Defendants argue that, without alleging any

physical harm or explicit threats, Plaintiff's allegations do not "remotely rise to the level of

restraint, threat, coercion, or abuse of legal process sufficient to state a claim under . . . the TVPA."

*Id.*  The court concludes otherwise.

Section 1589 of the TVPA—alleged to have been violated in Count II—prohibits

knowingly providing or obtaining labor of a person (1) "by means of force, threats of force,

physical restraint, or threats of physical restraint," (2) "by means of serious harm or threats of

serious harm," (3) "by means of the abuse or threatened abuse of law or legal process," *or* (4) "by means of any scheme, plan, or pattern intended to cause" the victim to believe that "serious harm or physical restraint" would result if the victim did not perform such labor.  18 U.S.C. § 1589(a)(1)-(4).  "Serious harm" is defined to include "any harm, whether physical or nonphysical, including psychological . . . harm, that is sufficiently serious, under all of the surrounding circumstances, to compel a reasonable person of the same background . . . to continue performing labor or services in order to avoid incurring that harm."  *Id.* § 1589(c)(2).  Notably, several courts have recognized that Congress enacted Section 1589 "to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers . . . restrain their victims without physical violence or injury."  *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012) (quoting H.R. Rep. No. 106-939, at 101 (2000) (Conf. Rep.)); *see also United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005) (acknowledging that "serious harm" is "intended to encompass not only physical violence, but also more subtle psychological methods of coercion").

Similarly, Section 1584—alleged to have been violated in Count III—subjects to criminal penalties a person who "knowingly and willfully holds to involuntary servitude . . . any other person for any term, or brings within the United States any person so held."  18 U.S.C. § 1584(a).  The TVPA defines the term "involuntary solitude" to include "a condition of servitude induced by means of any scheme, plan, or pattern intended to *cause a person to believe* that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint" or "the abuse or threatened abuse of the legal process."  TVPA § 103(5)(A)-(B) (codified at 22 U.S.C. § 7102(6)(A)-(B) (2015)) (emphasis added).

Congress' attempts to broaden the protections afforded to victims of human trafficking, coupled with the reasonable inferences this court must draw in favor of Plaintiff at this stage of the proceedings, lead the court to conclude that Plaintiff in both Counts II and III easily has stated a claim upon which relief can be granted.  Plaintiff alleges that Mustafa took her passport from her before she boarded the plane to the United States and, along with Atallah, kept the passport hidden in their home "for the entirety of Plaintiff's work for them."  Compl. ¶ 39.  Defendants required her to work 15 or more hours every day of the week without any days off, *id.* ¶¶ 1, 43-45; did not permit her to go outside the home without supervision, *id.* ¶¶ 46-48; allowed her only once-monthly contact with her family, *id.* ¶ 46; and warned her not to talk to others, "particularly other Filipinos." *Id.* ¶ 49.  Finally, Defendants never paid Plaintiff, even though they repeatedly promised her that they would make payment "tomorrow." *Id.* ¶¶ 50-52.  Taken together, these allegations are more than sufficient to give rise to a plausible inference that Defendants engaged in a "scheme, plan, or pattern" intended to make Plaintiff believe that "serious harm or physical restraint" would result if she did not continue to work for them.  No allegation of actual physical harm or an explicit threat of such harm is required to make out such a claim.

Defendants rely on *Muchira v. Al-Rawaf*, No. 1:14-CV-770-AJT/JFA, 2015 WL 1787144, at *6 (E.D. Va. Apr. 15, 2015), for the proposition that "house rules" prohibiting a plaintiff from going outside without permission, speaking to anyone in the neighborhood, or accessing her passport do "not rise to the level of 'threats of serious harm' that would force her to remain in the defendants' employment."  Mot. to Dismiss at 9.  Defendants' reliance on *Muchira* is misplaced for several reasons.  First, as Plaintiff points out, *Muchira* involved a motion for summary judgment, not as here a motion to dismiss.  *See* Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss, ECF No. 12 [hereinafter Opp'n], at 15.  Just as the *Muchira* court initially determined

that the plaintiff's allegations were "sufficient to make her claims plausible as to each of the defendants and to afford each of the defendants adequate notice of what the claims [were]," *see* Opp'n, Ex. C, at 10, this court also finds that Plaintiff's allegations are sufficient to state a claim.

Second, there are significant factual differences between *Muchira* and this case that make it readily distinguishable. The plaintiff in *Muchira* did not object to coming to the United States and even stated in her deposition that she wanted to come. 2015 WL 1787144, at *2. Additionally, she had posted and received around 15,000 Facebook messages and had "acknowledge[d] that some of these postings, such as those expressing her happiness and good fortune to be in the United States, were in fact true." *Id.* at *3 n.6. Plus, there was no evidence that the plaintiff in *Muchira* believed that she could not terminate her employment. *Id.* at *7. In contrast, here, Plaintiff objected to coming to the United States, Compl. ¶ 35; was not allowed to have any outside contact except once-a-month calls with her family, *id.* ¶ 46; and feared that if she tried to talk to the police she would be arrested and deported, *id.* ¶ 49. *Muchira* thus does not foreclose Plaintiff from proceeding to discovery on Counts II and III.

The court, however, will dismiss one aspect of Count III. In Count III, in addition to bringing a claim under the TVPA for violating 18 U.S.C. § 1584, Plaintiff asserts a "private cause of action implied under the Thirteenth Amendment." Compl. ¶ 80. But there is "no private right of action under the Thirteenth Amendment." *Doe v. Siddig*, 801 F. Supp. 2d 127, 135 (D.D.C. 2011) (citations omitted). The court therefore grants Defendants' motion insofar as Count III asserts a stand-alone claim under the Thirteenth Amendment.

### 2.    *Counts I, IV, and V*

Plaintiff puts forward three additional counts under the TVPA. In Count I, she alleges a violation of 18 U.S.C. § 1590 for transporting her from Jordan to the United States, Compl. ¶ 63;

in Count IV, a violation of 18 U.S.C. § 1592 for knowing removal, confiscation, concealment, and possession of her passport, *id.* ¶ 84; and in Count V, a violation of 18 U.S.C. § 1539A for "knowingly benefit[ing] financially and by receiving the value of Plaintiff's free round-the-clock labor," ¶ 89.   Both Plaintiff and Defendants agree that Counts I, IV, and V depend on Plaintiff sufficiently alleging predicate offenses under the TVPA.  *See* Opp'n at 17; Mot. to Dismiss at 14, 16-17; *see also Nunag-Tanedo v. E. Baton Rouge Parish Sch. B.*, 790 F. Supp. 2d 1134, 1146-47 (C.D. Cal. 2011) (finding that because plaintiff's complaint stated valid claims under Section 1589, it also established related claims under Sections 1590 and 1592).   As the court already has concluded that Plaintiff's allegations are sufficient to sustain Counts II and III, Counts I, IV, and V are sufficiently pled as well.

Defendants do make an additional argument as to the sufficiency of Count I.  They contend that Plaintiff's trafficking claim is deficient because "Plaintiff does not allege that Defendants Mustafa and Atallah recruited her or transported her from Jordan" as "[Plaintiff] flew alone, with her passport in hand, from Jordan to Dubai per instructions from her employer Defendant Lama." Mot. to Dismiss at 14-15.  In other words, Defendants contend that they were not involved in the "trafficking" of Plaintiff because they did not come in contact with her until Mustafa met her in Dubai.  But that argument ignores the allegation that Mustafa met Plaintiff in Dubai, where he took her passport, and then traveled with her to the United States.  Compl. ¶¶ 39-40.  Thus, Count I is not, as Defendants' claim, a mere "restatement of [Plaintiff's] forced labor claim."  Mot. to Dismiss at 15.  Plaintiff has sufficiently alleged facts to state a claim for trafficking in violation of 18 U.S.C. § 1590.

### B.      Conspiracy Claims (Counts VI and IX)

Plaintiff advances two conspiracy claims.  In Count IX, she alleges a common law claim of civil conspiracy.  Plaintiff avers that Defendants conspired to traffic her into the United States and to subject her to involuntary servitude and forced labor.[2]  Compl. ¶¶ 115-16.  In Count VI, under 42 U.S.C. § 1985(3), Plaintiff alleges a conspiracy to deprive her of her right to be free from involuntary servitude under the Thirteenth Amendment.  The court starts with Defendants' arguments as to Count IX because they overlap in part with their arguments as to Count VI.

#### 1.      Count IX

Defendants make two arguments regarding Plaintiff's civil conspiracy claim.  First, Defendants assert that both Counts VI and IX must be dismissed because "Plaintiff has set forth only conclusory allegations of an agreement between the three Defendants" and has failed to allege any particulars, such as an event, conversation, or document showing that there was an agreement.  Mot. to Dismiss at 19.  Second, with respect to Count IX, Defendants assert that Plaintiff has failed to sufficiently allege an underlying unlawful act, which is a prerequisite for a successful civil conspiracy claim.  *Id.* at 20-21.  The court rejects both arguments.

To support a claim of conspiracy, the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  An allegation of mere parallel conduct is not enough.  *Id.* at 557.  Nor are mere conclusory allegations.  *Id.* Importantly, however, courts in this circuit have recognized that "a plaintiff need not allege that an express or formal agreement was entered into."  *United States ex rel. Tran v. Comput. Scis.*

---

[2] Defendants correctly point out the Complaint only alleges that Mustafa and Atallah entered into an agreement with Lama to illegally traffic Plaintiff into the United States to subject her to involuntary servitude; it was not until her Opposition that Plaintiff contended that Defendants also conspired to subject her to forced labor.  *See* Defs.' Reply to Pl.'s Opp'n, ECF No. 15 [hereinafter Reply], at 10 n.4.  While Defendants are correct that Plaintiff may not amend her pleadings through her Opposition, *see e.g., Arbitraje Casa de Cambio, S.A. v. United States Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003), the court will not penalize Plaintiff for a single omission where it is apparent from the pleading as a whole that she intended to include forced labor as part of the civil conspiracy claim.

*Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014).  In fact, "in most civil conspiracy cases," courts are required to "infer an agreement from indirect evidence."  *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983).

Defendants have cited to *Grier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 42 (D.D.C. 2013), for the proposition that "one who alleges a conspiracy *must* allege an event, conversation, or document showing that there was an agreement among the alleged conspirators."  *See* Mot. to Dismiss at 19 (emphasis added).  This court, however, does not read *Grier* so strictly. *Grier* relied only on *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113–14 (D.D.C. 2010), *see Grier*, 983 F. Supp. at 42, which did not state such a mandatory rule of conspiracy pleading. Instead, *Acosta Orellana* simply cited one case in which a court held that the plaintiff had failed to plead a plausible agreement in a 162-page complaint which did not allege the existence of any event, conversation, or document.  *See Acosta Orellana*, 711 F. Supp. 2d at 114 (citing *McCreary v. Heath*, No. 04–0623(PLF), 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005)).  *Acosta Orellana* did not, however, state that a plaintiff was required to allege such specific circumstances in order to sufficiently state a conspiracy claim.  In any event, even if the existence of an event, conversation, or document must be plead, Plaintiff has satisfied that requirement.

Here, the Complaint contains sufficient facts from which the court can plausibly infer that there existed an agreement among Defendants to traffic Plaintiff from Jordan to the United States and put her into forced labor.  For starters, all Defendants, including Lama, are related to one another, making it reasonable to infer that their alleged actions were not mere parallel conduct. Next, the facts alleged make it reasonable to infer that there was some communication between Mustafa and his sister, Lama, regarding the transportation of Plaintiff to the United States for the purpose of providing labor.  Plaintiff alleges that, in the fall of 2012, Lama informed her that she

13

would be traveling to the United States to work for Mustafa for one month.  Compl. ¶ 37.  One week later, Lama arranged for a driver to take Plaintiff to the airport in Jordan where she was given her passport and boarded a plane to Dubai.  *Id.* ¶¶ 37-38.  Mustafa was waiting for Plaintiff at the airport in Dubai and together they traveled to the United States.  *Id.* ¶¶ 38-39.  Based on these facts, the court easily can infer that some communication took place between Mustafa and Lama to coordinate Plaintiff's travel to Defendants' home in the United States.  The Complaint, therefore, alleges sufficient facts to infer that Defendants reached an agreement.

As to Defendants second argument regarding Plaintiff's civil conspiracy claim—that Plaintiff has failed to plead an underlying unlawful act, Mot. to Dismiss at 20-21—that argument is foreclosed by the court's ruling that Plaintiff has successfully pleaded claims under the TVPA. *See supra* at Section III(A).

### 2.  *Count VI (Conspiracy under 42 U.S.C. § 1985(3))*

Although Plaintiff has successfully pleaded a common law civil conspiracy claim, her Complaint comes up short on her conspiracy claim under 42 U.S.C. § 1985(3).  To state a claim under Section 1985(3), Plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; [ ] and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (quoting *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987)).  Thus, even if a plaintiff states a claim for a conspiracy, a Section 1985(3) action will fail unless the plaintiff sufficiently alleges that the conspiracy was "motivated by some class-based, invidiously discriminatory animus." *Martin*, 830 F.2d at 258.

Here, Plaintiff has not sufficiently alleged that Defendants' actions were motivated by invidious discrimination.  Plaintiff contends that her allegations that Lama referred to her as an "animal," Compl. ¶¶ 32, and that Defendants instructed her not to talk to other Filipinos, *id.* ¶ 49, demonstrate race-based bias, Opp'n at 21.  The court disagrees.  Referring to Plaintiff as an "animal," without some additional context—and Plaintiff has offered none—cannot reasonably be construed to refer to Plaintiff's race, as opposed to its use as a generally degrading term. Additionally, as alleged, Lama's referring to Plaintiff as an "animal," preceded the agreement to traffic her to the United States; accordingly, her statement cannot be imputed to Defendants for the purpose of establishing *their* racial animus.  As for Defendants' instructing Plaintiff not to speak to other Filipinos, without more, that restriction is better understood as a means of isolating Plaintiff from others with whom she shares a common language and background, in order to prevent her from divulging Defendants' exploitative treatment of her, as opposed to an indication of invidious discrimination.  Plaintiff thus has failed to state a claim under Section 1985(3).

## C.      Fraudulent Inducement (Count XII)

In Count XII, Plaintiff advances a common law tort claim for fraudulent inducement.  That claim is based on the allegation that Defendants induced her to come to the United States to work for them based on three false representations:

> (1) [T]hey intended to pay her for work performed in the United States; (2) that her work in the United States would be in the service of Defendant Lama; and (3) that her work in the United States would not exceed the length of her original contract, such that she would be allowed to return home after a month in the United States.

Compl. ¶¶ 128-29.  Defendants counter, first, that the last two representations were only made by Lama and are thus not attributable to Mustafa and Atallah, and, second, that the third representation was not material to Plaintiff's decision to come to the United States.  *See* Mot. to Dismiss at 22-27.

To successfully state a fraudulent inducement claim in the District of Columbia, a plaintiff must plead "(1) a false representation[,] (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992).[3] In their Motion to Dismiss, Defendants do not deny that the last two alleged misrepresentations— that Plaintiff's work in the United States would be for Lama and that it would not exceed the length of her original contract—"meet the basic elements of a claim for fraudulent inducement with respect to Defendant Lama." Opp'n at 23; *see also* Mot. to Dismiss at 23-24. Rather, Defendants' sole objection to Plaintiff's claim as to those representations is that, because they were made by Lama, they cannot be held liable for them. *Id.*

Plaintiff counters that "Defendants are jointly responsible for Defendant Lama's actions in furtherance of that conspiracy" because Plaintiff "has adequately alleged a claim for civil conspiracy." Opp'n at 23. Defendants do not refute this argument and merely assert that Plaintiff's claim must fail because "the Complaint does not adequately set forth a claim for conspiracy." Reply at 15. Having decided that Plaintiff has stated a claim for civil conspiracy, *supra* at Section III(B), the court also finds that Plaintiff has sufficiently pleaded facts to hold Defendants liable for Lama's fraudulent statements.

As to the final statement—that Defendants intended to pay for Plaintiff's work— Defendants argue that a fraudulent inducement theory cannot be squared with Plaintiff's general assertion that she was forced to come to the United States. *See* Compl. ¶ 65 (alleging that "she was taken to this country against her will"); *see also* Mot. to Dismiss at 26-27. Admittedly, there is some tension between Plaintiff's trafficking claims—which rest on the premise that her will was

---

[3] While some courts have included a sixth element that the reliance be "reasonable," this generally applies "[w]here the transaction is commercial." *See Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 27 (D.D.C. 2000).

overborne—and her fraudulent inducement claim—which rests on the premise that she had some free will but was tricked into coming to the United States. The court does not, however, deem this tension to be fatal, as Plaintiff is permitted to plead inconsistent theories of liability at this stage of the proceedings. *See* Fed. R. Civ. P. 8(d)(2); *see also McNamara v. Picken*, 950 F. Supp. 125, 128-29 (D.D.C. 2013) (noting that "a plaintiff may plead inconsistent theories of liability, and . . . need not use particular words to plead in the alternative as long as it can be reasonably inferred that this is what [plaintiff was] doing.") (citation and internal quotation marks omitted).

Lastly, Defendants contend that the statement that they intended to pay for Plaintiff's work cannot give rise to a claim of fraudulent inducement because the statement concerns a future promise, whose breach only can be remedied by contract damages. Mot. to Dismiss at 25. "A promissory representation, or a representation as to future events . . . should only be considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform, or the promisor had knowledge that the events would not occur." *Bennett v. Kiggins*, 377 A.2d 57, 60-61 (D.C. 1977). In this case, Plaintiff alleges that Defendants never paid her a dime and that, when she asked for payment, they falsely told her that she would be paid "tomorrow." Comp. ¶ 51. From such allegations, it is plausible to infer that Defendants never had any intention of paying Plaintiff when they promised her that they would. Accordingly, the court denies Defendants' Motion to Dismiss as to the fraudulent inducement claim.

### D.     False Imprisonment (Count XIII)

In Count XIII, Plaintiff alleges that she was falsely imprisoned from November 2012 to March 2013. Compl. ¶¶135, 137. Defendants have moved to dismiss that claim on the ground that it is time-barred under the applicable one-year limitations period. Mot. to Dismiss at 27;

D.C. Code Ann. § 12-301(4).  Plaintiff does not oppose dismissal of her false imprisonment claim.

Opp'n at 25-26 n.7.  The court, therefore, will dismiss Count XIII.

## IV.      CONCLUSION

For the foregoing reasons, the court grants the Defendants' Motion to Dismiss in part and

denies it in part.  The motion is granted as to (1) Count VI for conspiracy to violate 42 U.S.C.

§ 1985(3); (2) Count III to the extent Plaintiff alleges a private cause of action implied under the

Thirteenth Amendment; and (3) Count XIII for false imprisonment.  The Motion is denied as to

all remaining claims challenged by Defendants.


Dated:  August 2, 2016                                      Amit P. Mehta
                                                            United States District Judge